**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| |
|---|
| IN RE COLUMBIA UNIVERSITY TUITION REFUND ACTION |

Lead Case No. 1:20-cv-03208

(JURY TRIAL DEMANDED)

## CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Student A, Chris Riotta, Lisa Guerra and Alexandra Taylor-Gutt ("Plaintiffs") by and through undersigned counsel, bring this action against The Board of Trustees of Columbia University in the City of New York ("Defendant" or the "University") on behalf of themselves and all others similarly situated, and make the following allegations based upon information, attorney investigation and belief, and upon Plaintiffs' own knowledge:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this case as a result of Defendant's decision not to issue appropriate refunds for the Spring 2020 semester after canceling in-person classes and changing all classes to an online/remote format, closing most campus buildings, and requiring all students who could leave campus to leave as a result of the Novel Coronavirus Disease ("COVID-19").

2.      This decision deprived Plaintiffs and the other members of the Classes from recognizing the benefits of on-campus enrollment, access to campus facilities, student activities, and other benefits and services in exchange for which they had already paid fees and tuition.

3.      Defendant has either refused to provide reimbursement for the tuition, fees and other costs that Defendant failed to provide during the Spring 2020 semester, or has provided inadequate and/or arbitrary reimbursement that does not fully compensate Plaintiffs and members of the Classes for their loss.

4.      This action seeks refunds of the amount Plaintiffs and other members of the Classes

are owed on a *pro-rata* basis, together with other damages as pled herein.

## PARTIES

5.      Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

6.      Columbia University in the City of New York is an institution of higher learning located in New York City, New York.

7.      Defendant Board of Trustees of Columbia University in the City of New York is the governing body vested with management and control of said institution.

8.      Upon information and belief, Defendant has an estimated endowment of approximately $10.9 Billion[1] and more than 33,000 enrolled students during the 2019-2020 academic year.[2]

9.      Moreover, upon information and belief, Defendant was allocated more than $12.8 million of federal stimulus funds under the CARES Act.  The CARES Act directs that institutions must use at least half of the funds they receive to provide emergency financial aid grants to students for expenses related to the disruption of campus operations due to COVID-19.

10.     According to the University's Assistant Vice President of Student Financial Services, Cynthia Grunden, Columbia has no plans to allocate even one dollar more than they are legally required to for student relief, presumably retaining the rest.[3]

---

[1]      Columbia Spectator, October 12, 2019:
https://www.columbiaspectator.com/news/2019/10/12/columbia-reports-38-percent-endowment-return-lowest-in-the-ivy-league/.
[2]      Columbia University Headcount Enrollment by School, 2010-2019.  Columbia Office of the Provost.  January 13, 2020.
https://opir.columbia.edu/sites/default/files/content/Statistical%20Abstract/opir_enrollment_history.pdf.
[3]      "The plan is to award the amount that was specifically allocated for students, I don't foresee us awarding anything above that."  *The Columbia Chronicle*, April 28, 2020.

11.     Plaintiff A is an individual and a resident and citizen of a state other than New York, and was a student enrolled at Columbia University during the Spring 2020 term.

12.     Plaintiff Chris Riotta is an individual and a resident and citizen of the state of New York, and was a student enrolled at Columbia University during the Spring 2020 term.

13.     Plaintiff Lisa Guerra is an individual and a resident and citizen of the state of Connecticut, and was a student enrolled at Columbia University during the Spring 2020 term.

14.     Plaintiff Alexandra Taylor-Gutt is an individual and a resident and citizen of the state of New York, and was a student enrolled at Columbia University during the Spring 2020 term.

## JURISDICTION AND VENUE

15.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

16.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

17.     This Court has personal jurisdiction over Defendant because Defendant conducts business in New York and has sufficient minimum contacts with New York.

18.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

---

https://columbiachronicle.com/most-columbia-students-to-receive-grants-but-cares-act-wont-entirely-offset-college-losses.

## BACKGROUND FACTS

19.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

20.     Plaintiffs were each enrolled as full-time or part-time students for the Spring 2020 academic semester at Defendant's institution.

21.      As a precondition for enrollment, Plaintiffs were required to and did pay substantial tuition for the Spring 2020 semester either out of pocket or by utilizing student loan financing, as did all members of the putative Tuition Class (defined below).

22.     There are hundreds, if not thousands, of institutions of higher learning in this country.

23.     Some institutions of higher learning provide curriculum and instruction that are offered on a remote basis through online programming which do not provide for physical attendance by the students.

24.     Defendant's institution offers both in-person, hands-on programs, and fully online distance-learning programs, which it markets and prices as separate and distinct products.

25.     Plaintiffs and members of the proposed Tuition Class did not choose to attend another institution of higher learning, or to seek an online degree, but instead chose to attend Defendant's institution and specifically chose the on-campus program and enrolled on that basis.

26.     Defendant has recognized and admitted the inherent difference between its in-person and online products, and markets them separately throughout its website and other publications and circulars, including its academic catalogs.

27.     Accordingly, when students pay tuition in exchange for enrollment in the on-campus program, such students expect to receive, and Defendant has promised to provide, benefits

and services above and beyond basic academic instruction, which include but are not limited to:

- Face-to-face interaction with professors, mentors, and peers;

- Access to facilities such as computer labs, study rooms, laboratories, libraries, etc.;

- Student governance and student unions;

- Extra-curricular activities, groups, intramurals, etc.;

- Student art, cultures, and other activities;

- Exposure to community members of diverse backgrounds, cultures, and schools of thought;

- Social development and independence;

- Hands-on learning and experimentation; and

- Networking and mentorship opportunities.

28.     Plaintiffs' education was changed from in-person, hands-on learning to online instruction during the Spring 2020 term.

29.     When this happened, Plaintiffs were forced from campus and deprived of the benefit of the bargain for which they had paid, and in exchange for which Defendant had accepted, tuition as set forth more fully above.

30.     In addition to tuition, Defendant charges certain mandatory fees, including but not limited to a:

- University Facilities Fee;

- Student Life Fee;

- Student Activity Fee; and

- Health and Related Services Fee.

31.     The University Facilities Fee is charged to all graduate students (full and part-time) registered for classes on the Morningside Campus.[4]

32.     The Student Life Fee is charged to all undergraduate students (full and part-time) registered in Columbia College, the Fu Foundation School of Engineering and Applied Science, and the School of General Studies; and all MDE, MS, Certificate, DNP and PhD students in the School of Nursing.[5]

33.     The Student Activity Fee is charged to all on-campus graduate students (full and part-time) except those in the Schools of Architecture, Business, Journalism, and Nursing.[6]

34.     The Health and related Services Fee is charged to all full-time and residential students on the Morningside Campus, but may be waived in very limited circumstances.

35.     Plaintiffs were required to and did pay all mandatory fees associated with their Spring 2020 enrollment.

36.     Specifically, Plaintiffs Riotta, Guerra and Student A were required to and did pay the University Facilities Fee.

37.     Plaintiffs Guerra and Student A were also required to and did pay the Student Activity Fee.

38.     Plaintiff Taylor-Gutt was required to and did pay the Student Life Fee.

39.     Plaintiffs Taylor-Gutt and Student A were required to and did pay the Health and Related Services Fee.

40.     In addition to the broad-based mandatory fees described above, Defendant charges a myriad of other program or course specific fees, such as a technology fee paid by Plaintiff Guerra

---

[4] *See*, *generally*, https://sfs.columbia.edu/tuition.
[5] *Id.*
[6] *Id.*

and a Visual Arts Fee and Creative Writing Fee paid by Plaintiff Taylor-Gutt.

41.     The University states that the Facilities Fee "provides students access to the facilities at the Dodge Physical Fitness Center and Lerner Hall, and supports enhancements for the libraries and computer networks."[7]

42.     The University states that the Student Life Fee is "[a] mandatory fee supporting student activities, access to the facilities at the Dodge Physical Fitness Center and Lerner Hall, and library and computer network privileges."[8]

43.     The University states that the Student Activity Fee is "charged to all students to help cover the costs of student events, activities, and to help fund student organizations."[9]

44.     The University states that the Health and Related Services Fee grants students "access [to] the programs and services provided through Columbia Health's five departments, including 24/7 support from Counseling & Psychological Services, Medical Services, and Sexual Violence Response."[10]

45.     As a result of the actions and announcements of Defendant during the Spring 2020 term, Plaintiffs and members of the Fees Class (defined below) no longer had the benefit of the services for which these fees were paid.  For example, the Dodge Center and Lerner Hall were closed, student events and activities were cancelled, student organizations were no longer operational, and students who moved home no longer had the need for or access to the various health facilities.

46.     At Defendant's request and direction, certain Plaintiffs and members of the Classes

---

[7] https://socialwork.columbia.edu/admissions/tuition-financial-aid/cost-attendance-new-york-city-campus-explanation/.
[8] https://cc-seas.financialaid.columbia.edu/content/student-life-fee.
[9] *Id.*
[10] *Id.*

moved out of on-campus housing and lost access to any campus facilities and services thereon throughout the remainder of the Spring 2020 term.

47.     For example, Plaintiff Student A moved out of on-campus housing on or before March 17, 2020 and was unable to return to campus for the remainder of the Spring 2020 term, and had no access to any campus facilities or services from that date.

## FACTUAL ALLEGATIONS

48.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

49.     Upon information and belief, Defendant's Spring term began with the first day of classes on or about January 21, 2020.[11]

50.     Upon information and belief, Defendant's Spring term was scheduled to conclude with the last day of examinations on or about May 15, 2020 and commencement ceremonies on May 20, 2020.[12]

51.     Accordingly, Defendant's Spring semester was scheduled and contracted to consist of approximately 120 days.

52.     However, as a result of the COVID-19 pandemic, Defendant announced on March 8, 2020 that it was suspending classes on Monday, March 9, 2020 and Tuesday, March 10, 2020 and thereafter moving all classes online for the remainder of the semester upon resumption on March 12, 2020.[13]

53.     On March 12, 2020, Defendant encouraged most students to move out of their

---

[11] https://registrar.columbia.edu/calendar?page=1.
[12] *Id.*
[13] https://covid19.columbia.edu/news/update-covid-19-and-class-activity.

residence halls.[14]

54.     On or about March 15, 2020, Defendant announced that students would be required to move out of their residence halls (absent a waiver) and that the deadline to do so would be March 17, 2020.[15]

55.     Also, on March 15, 2020, Defendant began to close all on-campus student facilities such as libraries and other buildings and non-essential offices.[16]

56.     Almost immediately, students began demanding refunds for the fees and charges demanded in this action.

57.     As early as March 12, 2020, the students at Defendant's institution started a petition which stated:[17]

> With this in mind, we call upon the University to address the reduction of educational quality that the transition to online classes represents, as well as the negative professional impacts of reduced networking opportunities and cancelled campus events, by providing students with a partial tuition reimbursement. We note that the University has a sizable endowment at their disposal and could use some of these funds to help protect their students (who themselves represent future donors) during these trying times. Thank you for your reading and sharing.

58.     Upon information and belief, other petitions have since been circulated, and have

---

[14] https://covid19.columbia.edu/news/all-undergraduate-students-encouraged-move-out-residence-halls.
[15] https://covid19.columbia.edu/news/accelerated-check-out-timeline-undergraduate-residents.
[16] https://covid19.columbia.edu/news/university-libraries-closed-until-further-notice.
[17] https://www.change.org/p/columbia-university-partial-tuition-reimbursement-at-columbia-university.

collectively received over 10,000 signatures.[18]

59.     Based on the dates set forth above, upon information and belief, Defendant's move to online classes and constructive eviction of students on March 15, 2020 deprived Plaintiffs and other members of the Classes from access to campus facilities and in-person instruction for approximately 55% of the semester for which they had contracted.

60.     Although Defendant continued to offer some level of academic instruction via online classes, Plaintiffs and members of the proposed Tuition Class were deprived of the benefits of on-campus enrollment for which they paid as set forth more fully above.

61.     These realities notwithstanding, Defendant has refused and continues to refuse to offer any refund whatsoever with respect to the tuition that has already been paid.

62.     Likewise, Plaintiffs and members of the proposed Fees Class were deprived of utilizing services for which they have already paid, such as access to campus facilities, student activities, health services and other opportunities.

63.     While Defendant has refunded some of the fees, such refund has come with no explanation, is arbitrary, and in any event, is wholly insufficient.

64.     For example, although Plaintiff Student A paid a total of $1,065 in mandatory fees as set forth above, he was refunded only $119 or roughly 11%.

65.     Likewise, whereas Plaintiff Taylor-Gutt paid $1,386 in mandatory fees, she was refunded only $144 or roughly 10%.

66.     Defendant has announced that it will be issuing full *pro-rata* refunds for room and board fees.  Accordingly, this action does not seek to certify an On-Campus Housing Class or

---

[18] *See also* https://www.change.org/p/columbia-university-columbia-students-demand-partial-springtuition-refund-or-lower-tuition-for-next-semester/sign.

Meals Class for the recovery of those funds.  However, Plaintiffs reserves the right to amend these allegations should Defendant fail or refuse to issue these refunds as promised.

## CLASS ACTION ALLEGATIONS

67. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

68. Plaintiffs brings this action on behalf of themselves and as a class action, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Classes:

**The Tuition Class:**

All people who paid tuition for or on behalf of students enrolled in classes at the University for the Spring 2020 semester but were denied live, in-person instruction and forced to use online distance learning platforms for the latter portion of that semester.

**The Fees Class:**

All people who paid fees for or on behalf of students enrolled in classes at the University for the Spring 2020 semester.

69. Excluded from the Classes are The Board of Trustees of Columbia University in the City of New York, and any of their respective members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the judicial officers, and their immediate family members, and Court staff assigned to this case.  Plaintiffs reserve the right to modify or amend the Class definitions, as appropriate, during the course of this litigation.

70. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

71. This action has been brought and may be properly maintained on behalf of the

Classes proposed herein under Federal Rule of Civil Procedure 23.

**Numerosity: Fed. R. Civ. P. 23(a)(1)**

72.     The members of the Classes are so numerous and geographically dispersed that individual joinder of all members is impracticable.  Plaintiffs are informed and believe that there are thousands of members of the Classes, the precise number being unknown to Plaintiffs, but such number being ascertainable from Defendant's records.  Members of the Classes may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

**Commonality and Predominance: Fed. R. Civ. P. 23(a)(2)**

73.     This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes, including, without limitation:

(a)     Whether Defendant engaged in the conduct alleged herein;

(b)     Whether there is a difference in value between enrollment in an online distance learning program and enrollment in a live, on-campus instructional program;

(c)     Whether Defendant breached its contracts with Plaintiffs and the other members of the Tuition Class by retaining the portion of their tuition representing the difference between the value of online distance learning and on-campus, in-person enrollment;

(d)     Whether Defendant was unjustly enriched by retaining tuition payments of Plaintiffs and the Tuition Class representing the difference between the value of online distance learning and on-campus, in-person enrollment;

(e)     Whether Defendant breached its contracts with Plaintiffs and the other

members of the Fees Class by retaining fees without providing the services,

benefits and/or programs the fees were contracted to cover;

(f)     Whether Defendant was unjustly enriched by retaining fees of Plaintiffs and

the other members of the Fees Class without providing the services, benefits

and/or programs the fees were intended to cover;

(g)     Whether Defendant committed conversion as detailed above against

Plaintiffs and the other members of the Tuition Class;

(h)     Whether Defendant committed conversion as detailed above against

Plaintiffs and the other members of the Fees Class;

(i)     Whether Defendant violated New York General Business Law § 349, § 350

*et seq.* as to Plaintiffs and the other members of the Tuition Class;

(j)     Whether Defendant violated New York General Business Law § 349, § 350

*et seq.* as to Plaintiffs and the other members of the Fees Class;

(k)     Whether certification of any or all of the classes proposed herein is

appropriate under Fed. R. Civ. P. 23;

(l)     Whether Class members are entitled to declaratory, equitable, or injunctive

relief, and/or other relief; and

(m)     The amount and nature of relief to be awarded to Plaintiffs and the other

members of the Classes.

**Typicality: Fed. R. Civ. P. 23(a)(3)**

74.     Plaintiffs' claims are typical of the claims of other members of the Classes because,

among other things, all such members were similarly situated and were comparably injured

through Defendant's wrongful conduct as set forth herein.

**Adequacy: Fed. R. Civ. P. 23(a)(4)**

75.     Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of other members of the Classes they seek to represent.  Plaintiffs have retained counsel competent and experienced in complex litigation and Plaintiffs intend to prosecute the action vigorously.  The interests of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

**Superiority: Fed. R. Civ. P. 23(b)(3)**

76.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and other members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Classes to individually seek redress for Defendant's wrongful conduct.

77.     Even if members of the Classes could afford individual litigation, the Court system likely could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, comprehensive supervision by a single court, and finality of the litigation.

**Certification of Specific Issues: Fed. R. Civ. P. 23(c)(4)**

78.     To the extent that any described Class herein does not meet the requirements of Rules 23(b)(2) or (b)(3), Plaintiffs seek the certification of issues that will drive the litigation

toward resolution.

**Declaratory and Injunctive Relief: Fed. R. Civ. P. 23(b)(2)**

79.    Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described herein, with respect to the members of the Classes as a whole.

**FOR A FIRST COLLECTIVE CAUSE OF ACTION**
**BREACH OF CONTRACT**

**(Plaintiffs and Other Members of the Tuition Class)**

80.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

81.    Plaintiffs bring this count on behalf of themselves and other members of the Tuition Class.

82.    Plaintiffs and the other members of the Tuition Class entered into contracts with Defendant which provided that Plaintiffs and other members of the Tuition Class would pay tuition for or on behalf of students and, in exchange, Defendant would enroll such students and admit them to campus; granting them the full rights and privileges of student status, including but not limited to access to campus facilities, access to campus activities, and live, in-person instruction in a physical classroom.

83.    Defendant defines enrollment as "the completion of the registration process [and] the payment or other satisfaction of tuition and fees and by the satisfaction of other obligations to the University."[19]

84.    Defendant defines registration as "the systematic process that reserves seats in

---

[19] http://bulletin.columbia.edu/columbia-college/registration/

particular classes for eligible students. It is accomplished by following the procedures announced in advance of each term's registration period."[20]

85.     Defendant declares that enrollment "affords the full rights and privileges of student status."[21]

86.     The rights and privileges of student status that comprise the contractual terms are set forth by Defendant through its website, academic catalogs, student handbooks, correspondence, marketing materials and other circulars, bulletins, and publications.

87.     These rights and privileges form the basis of the bargain on which prospective students agree to accept Defendant's offer of enrollment in exchange for the payment of tuition and fees.

88.     One such right is the ability to be physically present on campus, and fully enjoy the facilities, services, and opportunities provided thereon, including the campus' location and surrounding opportunities within New York City.

89.     Defendant does not deny that the physical location of its campus is a main benefit of enrollment that attracts many students to the University.  *See, e.g.,* ¶ 118, *infra*.

90.     Indeed, Defendant's connection to its location is indelibly enshrined in the official name of the University, "Columbia University *in the City of New York.*" (emphasis added).

91.     Likewise, Defendant's connection to the City of New York is acknowledged in the University Mission Statement, which states "The University recognizes the importance of its location in New York City and seeks to link its research and teaching to the vast resources of a great metropolis."

---

[20] *Id*.
[21] *Id*.

92.     Defendant's website and recruitment brochures are the primary means through which Defendant targets prospective new students and attempts to influence such students to apply for enrollment at the University as opposed to other institutions of higher learning.

93.     Through these publications, Defendant markets to and enrolls students in two separate and distinct products.

94.     Defendant specifically markets certain classes and degree programs as being offered on a fully online basis.

95.     Indeed, Defendant dedicates an entire section of its website to these programs, known as "Columbia Online" which can be accessed at www.online.columbia.edu.

96.     Conversely, Defendant's publications with respect to non-online classes are full of references to the on-campus experience, including numerous references to student activities; campus amenities; class size and student/teacher ratios; campus diversity, campus location, and the like.

97.     When visitors enter the "About" page on Defendant's main website (www.columbia.edu/content/about-columbia), they are greeted with a full screen promotional video.

98.     The video, quoting alumnus Herman Woke, begins:

Within the rectilinear boundaries of 114th Street and 120th Street, of Broadway and Morningside Drive, there is a peaceful oasis of the life of the mind, defiantly independent of the surrounding marketplace racket of Manhattan. The best things of the moment were outside the rectangle of Columbia; the best things of all human history and thought were inside. If only you had the sense, you could spend four years in an unforgettably exciting and improving alternation between two realms of magic.

99.     The narration is transposed over dramatic music and visual depictions of campus buildings, campus activities, and the surrounding city.

100.    Not only is this video prominently featured on Defendant's website, it is aired on television through paid advertising spots promising potential students that if they enroll, they will receive the benefits of this specific physical location – Columbia University in the City of New York.

101.    Students seeking further information about the University are directed to the admissions website, www.undergrad.admissions.columbia.edu/.

102.    Here, Defendant markets the following statistics:

- 500+ clubs and organizations;

- 22 libraries;

- 20+ residence halls;

- 200+ research institutes and centers, including a wide range of world class laboratories;

- 1000's of internships;

- 400 research opportunities;

- 1,000+ restaurants in NYC;

- 1,700 parks and playgrounds across the city;

- 150 museums and countless galleries across NYC;

- 30+ museums accessible for free with a Columbia ID;

- 40 Broadway theaters across NYC;

- 100+ service and research partnerships across New York City;

- 8 Million people living in NYC;

- 40+ religious/spiritual campus organizations;

- 45+ club sports;

- 40+ intramural sports;

- 17,000 seats in the stadium at Baker Field, home to Columbia's football, baseball, softball, rowing, field hockey, lacrosse, soccer, tennis and track and field teams;

- 13 environmental and outdoor clubs; and

- 6 to 1 student to faculty ratio

103.    In answering frequently asked questions, Defendant goes on to state:

> 80% of undergraduate classes taught at Columbia have fewer than 20 students. Since Columbia's Core classes are small seminar classes and since more advanced courses are meant to allow direct connection with faculty, few courses at Columbia are larger than 20 students.
>
> Columbia's location in New York and access to internships are among the most distinct advantages of our educational experience.
>
> Morningside Heights is a residential neighborhood located on the west side of the island of Manhattan. It is approximately a ten-minute walk from the northwestern tip of Central Park and another ten-minute walk to the heart of Historic Harlem. Columbia is located on the #1 subway line and various bus routes. On the #1 train students can get to Times Square in approximately 20 minutes, go uptown to Columbia's Medical Center in 15 minutes, and get to Columbia's Baker Field Athletic Complex at the northern tip of Manhattan in 25 minutes.
>
> Columbia undergraduate students are guaranteed housing for all four years. Nearly all undergraduates live on campus all four years and first-year students are required to live on campus.
>
> Students are guaranteed housing for up to 8 terms during their time at Columbia. Over 95% of undergraduate students and 100% of the Class of 2016 live on campus.
>
> Columbia holds classes from early in the morning until late at night. This allows students to hold on-campus jobs, pursue internships in the city and adjust their schedules to make the

most of their academic and extracurricular experience.

The Core Curriculum is the cornerstone of a Columbia education… The hallmark of the Core is its commitment to the critical examination of challenging ideas in the context of small and intensive classes… The small size of Core Curriculum classes provides students with the opportunity to develop early on in their Columbia careers close relationships with faculty and to participate with them in a shared process of intellectual inquiry.

You are living in New York City! Students also find New York to be an incredible extended classroom. See a painting up close at the Metropolitan Museum of Art, listen to some of the world's greatest musicians at a small jazz club in the West Village and encounter dozens of cultures, thousands of ideas and millions of people, all in your future home.

Though celebrated for their content, [core] courses are equally important for their small class format. The hallmark courses in the Core… are taught in seminars of approximately 22 students; these courses ensure that education at Columbia begins with an emphasis on every student's active intellectual engagement.

New York City has something for everyone, which is why it is so often rated as one of the best college towns in the nation.

104.    Prospective students seeking additional information are invited to download the

University's "Columbia Blue" publication which makes the following representations, among

others:

At Home in the City and in the World: Columbia guarantees on-campus housing all four years and factors your meals, books and personal expenses into your financial aid eligibility, so every opportunity is possible in the world's greatest city, from food truck festivals to Hudson River kayaking, Museum Mile to Broadway. And with financial aid that travels with you for study abroad, the whole world can be your classroom.

Learning is not confined to Columbia's seminar rooms and labs. Campus jobs can broaden your network and open doors to experiential learning. And programs like the Work Exemption Program fund students pursuing enrichment activities such as unpaid internship, volunteer and research opportunities.

Going to Columbia gives you a kind of dual citizenship — you are a Columbian and a New Yorker. Each in itself is a life changer. The combination? Unequaled.

More than 200 research institutes and centers, including a wide range of world-class laboratories.

Columbia is an in-person kind of place — a crossroads of connections where there is no distance at all between those on their way to living lives of impact and influence and those already doing so. Here are just some of the people who recently visited campus and connected with students: [list of famous faculty members, politicians, scholars, etc.]

The world's city, home to major institutions in innovation, culture, media, science, education, health, politics, finance, and technology. Our New York is a neighborhood, a classroom, a leader, a community, a testing ground, a cultural wonderland, a source of inspiration, a home, a friend, an indispensable resource.

Our students are part of an unparalleled mix of Ivy League university and world-class city.

At Columbia you're part of knowledge in the making — yours and the world's. The beauty of being on this campus is that today's thought leaders, genius innovators, and literary lions want to teach. These giants in their fields, who keep open office hours and teach and mentor undergraduates, have a way of inspiring their students to take their own giant steps.

In labs, in partnerships with New York City, and in global fieldwork — research at Columbia is about solving huge problems like climate change and hunger, as well as investigating enduring mysteries like the origin of the universe. It's about impacting the world with new technologies, new social media, new ways of looking at the human body, and new animation techniques. Getting involved in research here is no Ivory Tower exercise. It's faculty and students actively working wonders.

It starts with the people. Columbia is a place of great friendships, a place where connecting is a way of life. Being surrounded by so many incredible people all in one spot makes the global and

the grand human and personal.

Columbia guarantees housing for all four years and about 95% of our students live on campus. Columbia is its own village within Manhattan. More than a place to live, Columbia is a vibrant residential community.

Residence hall life, small classes, research and project teams, clubs and causes — the campus events that bring everyone out exploring the city together create communities within communities. Your circles of community begin on our classic campus, and extend to the intimate, friendly neighborhood that surrounds us, on to the world-class city we are part of, and into the world itself.

Columbia's neighborhood is Morningside Heights, which stretches from 106th to 125th Streets and is bordered by Central Park, Morningside Park, and Riverside Park. Rich in both American and Columbian history and teeming with the energy of Columbia undergraduates, Morningside Heights is a charming residential enclave that is at once bustling and intimate.

105.    Defendant's office of admissions also maintains a number of official social media accounts, including a YouTube channel.  The channel contains videos, among others, entitled "Choosing Columbia: New York City," Favorite Spots on Campus," "New York City," "Community Traditions," "Get Going: Central Park," "How to Eat a Slice of New York-Style Pizza," "The Columbia experience is not only a classroom experience, but an experience of the city of New York itself," together with a number of "Day in the Life Videos" of students highlighting their on-campus experiences in diary format.  The channel also features a video entitled "Choosing Columbia: Why We Made the Decision" in which current students are interviewed.  Every student on the video states that their first reason for choosing Columbia University was its physical location in New York City.

106.    Upon information and belief, there were no references or disclaimers in any of Defendant's websites, circulars, bulletins, publications, brochures, or other advertisements prior

to January 31, 2020, that even referenced the possibility of in-person classes being changed to fully online classes at Defendant's discretion or for any other reason whatsoever after the start of a given term.[22]

107.    In fact, it is clear that, prior to the COVID-19 interruption, Defendant had no plans whatsoever to offer its in-person classes via an online delivery model.  This is evident from the fact that the University had to cancel classes for two days while its professors hurriedly and ineffectively scrambled to make the switch.

108.    Those prospective students who were interested in enrolling at the University after consuming the marketing materials described above were invited to complete applications, and some were selected for and offered admission.

109.    When a student is offered admission to the University, that student receives a number of further communications and has a number of additional interactions with Defendant.

110.    Initially, the student will receive an official offer letter.  For example, students selected for the Columbia College class of 2023 received a letter from Dean Marinaccio.

111.    In this letter, Dean Marinaccio stated "We are fully confident that the gifts you bring to our campus will be unique and valuable and that your abilities will be challenged and developed here."

112.    The letter goes on to state, "The Columbia faculty, students and administration look forward to welcoming you into a community that thrives on our combination of a timeless and transformational curriculum, a diverse and talented student body and a dynamic city with unparalleled opportunities."

---

[22] January 31, 2020 is the approximate date that students were permitted to withdraw from the University for the Spring 2020 term and receive a full tuition refund.

113.    Accepted students are directed to review the "Welcome Website" for additional information and to acknowledge acceptance of the "offer of admission" by a certain deadline.

114.    Accepted students are also invited to attend an "Admitted Students Day" (which is hosted on Defendant's campus) where Defendant again attempts to convince such students to accept their offers of admission by highlighting the University's location and the many benefits of being on campus.

115.    During this time, the students also receive an "Admitted Student Handbook" from their respective school or program.

116.    The Admitted Student Handbook for the Columbia Law School Class of 2022 opens with a welcome letter from the Office of Admissions on page 3 which states "the best way to see whether Columbia Law School is the right fit for you is to come to campus and experience the community for yourself."

117.    The Handbook goes on to state on page 15 that "Columbia's location in New York City, a truly international capital and one of the largest legal markets in the world, has served its students as a classroom, laboratory, and community to serve.  Additionally, Columbia Law School and the greater university offer a broad range of courses and experiential opportunities that allow for a truly interdisciplinary and hands-on approach to modern legal education."

118.    On page 50 of the Handbook, Defendant acknowledges, "[u]ndeniably, many students choose Columbia for its location.  There is no doubt that our students leverage all that New York City has to offer to enhance their legal education."

119.    Defendant goes on to state that "[i]ndeed, New York City is Columbia's laboratory…."

120.    When students officially accept their offers, they are flooded with a number of other

communications from the school.

121.    The Class of 2020 received an email entitled "Congratulations from Columbia's Undergraduate Recruitment Committee!" in which Defendant encouraged students to "learn about all that Columbia has to offer; learn more about Columbia's nearly 500 student clubs and organizations; [and] explore our neighborhood of Morningside Heights and all the great opportunities New York City has to offer…"

122.    The email closes by saying "We hope you enjoy imagining yourself joining us in Morningside Heights this fall…"

123.    Those students who accepted Columbia's offer received another email entitled "Welcome from Columbia College Dean James J. Valentini" which opened "Columbia College is the greatest college in the greatest university in the greatest city in the world, and your presence here will make it even better."

124.    The email goes on to claim, "[o]ur home in the great international metropolis of New York City means even more possibilities."

125.    The email closes by stating, "I look forward to meeting you this fall, on College Walk, at John Jay Dining Hall or Butler Library, or in Hamilton Hall, where my office is."

126.    Those students who accepted Columbia's offer received other emails including "Diversity at Columbia University" "Meeting Your Future Columbia Classmates" and "Columbians Share their Favorite Places."

127.    Before the start of their first semester, students are required to attend a mandatory new student orientation program on-campus.

128.    Students starting in the School of General Studies during the Fall 2019 semester were greeted at orientation with a welcome letter from the Dean of Students stating, "[w]e urge

you to fully embrace the GS student community; you will learn as much from one another as you will learn from our amazing Columbia faculty.  We cannot overstate what a significant contribution you make to the intellectual discourse on campus."

129.    Once students make it through orientation [and for returning students], it comes time to register for classes.  This is another area where Defendant specifically emphasizes the distinction between its in-person and online class offerings through the academic catalogs and course listings on the website.

130.    Each of Defendant's academic programs is listed separately on the University's student financial services website with the specific tuition and fees charged for the specific program.

131.    That website is found at https://sfs.columbia.edu/tuitions-fees-listing.

132.    Each online program is specifically delineated as such, with the in-person programs not so delineated.

133.    When students log on to the Student Services Online (SSOL) registration portal to select their in-person classes, each class is listed not only by description, but also by meeting time and physical classroom location.

134.    Likewise, given the synchronous nature of the in-person classes, Defendant's registration policies state, "Students may not register for courses whose meeting times overlap."

135.    Upon registration, students in many of Defendant's on-campus schools and programs were subject to strict personal attendance requirements as set forth in various departmental policies and handbooks, evidencing Defendant's requirement and the student's acceptance of the requirement that such students physically attend such classes on campus.

136.    That Defendant offered to provide, and members of the Tuition Class expected to

receive, instruction on the physical campus is further evidenced by the parties' prior course of conduct.

137.    Those classes for which students expected to receive in-person instruction began the Spring 2020 semester by offering in-person instruction.

138.    Each day for the weeks and months leading up to March 12, 2020, students attended physical classrooms to receive in-person instruction, and Defendant provided such in-person instruction.

139.    Likewise, upon information and belief, most students were provided with syllabi and other documents that referenced class meeting schedules, locations, and physical attendance requirements.

140.    Each day for the weeks and months prior to announced closures, students had access to the full campus.

141.    Accordingly, it is clear that Defendant offered to provide live, in-person education, together with a full on-campus experience and that members of the Tuition Class accepted that offer by paying tuition and attending classes during the beginning of the Spring 2020 semester.

142.    This distinction is highlighted further by Defendant's own transfer credit policy.

143.    According to Defendant's policies, credits are only eligible to transfer from another institution if they are "analogous to undergraduate courses offered at Columbia College."[23]

144.    The transfer policy further dictates, "All instruction in the classes has to be face-to-face in person in a classroom setting.  No course taught entirely or partially online will be accepted for credit."[24]

---

[23] https://www.cc-seas.columbia.edu/csa/transfercredit

[24] *Id.*

145.    On the School of General Studies website, Defendant is even more explicit: "Columbia University does not offer online courses for credit; therefore, online courses are not eligible for transfer credit."[25]

146.    Defendant's transfer credit policy clearly articulates Defendant's position: that online classes are not analogous to Columbia University classes, because Columbia University classes are taught face-to-face in person in a classroom setting.

147.    Based on this mutual assent, Plaintiffs and other members of the Tuition Class fulfilled their end of the bargain when they paid tuition for the Spring 2020 semester, either by paying out of pocket or by using student loan financing, or otherwise.

148.    However, the University breached the contract with Plaintiffs and other members of the Tuition Class by moving all classes for the Spring 2020 semester to online distance learning platforms, and restricting the on-campus experience without reducing or refunding tuition accordingly.

149.    This cause of action does not seek to allege "academic malpractice."

150.    Rather, it is clear from the facts and circumstances that Defendant offered two separate and distinct products, one being live, in-person, on-campus education, with its featured ancillary and related services, and the other being online distance education.

151.    Plaintiffs and members of the Tuition Class accepted Defendant's offer for live in-person on-campus education and paid valuable consideration in exchange.

152.    However, after accepting such consideration from Plaintiffs and other members of the Tuition Class, Defendant provided a materially different product, which deprived Plaintiffs and other members of the Tuition Class of the benefit of the bargain for which they had already

---

[25] http://bulletin.columbia.edu/general-studies/transfer-credit/

paid.

153.    Defendant retained tuition monies paid by Plaintiffs and other members of the Tuition Class, without providing them the full benefit of their bargain.

154.    Plaintiffs and other members of the Tuition Class have suffered damage as a direct and proximate result of Defendant's breach amounting to the difference in the fair market value of the services and access for which they contracted, and the services and access which they actually received.

155.    As a direct and proximate result of Defendant's breach, Plaintiffs and other members of the Tuition Class are legally and equitably entitled to damages, to be decided by the trier of fact in this action, to include disgorgement of the difference between the fair market value of the online learning provided versus the fair market value of the live, in-person instruction in a physical classroom on a physical campus with all the attendant benefits for which they contracted.

### FOR A SECOND COLLECTIVE CAUSE OF ACTION
### UNJUST ENRICHMENT

### (Plaintiffs and Other Members of the Tuition Class)

156.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

157.    Plaintiffs bring this count on behalf of themselves and other members of the Tuition Class.

158.    This claim is pled in the alternative to, and to the extent it is determined a contract does not exist or otherwise apply, the contract-based claim set forth in the First Cause of Action above.

159.    Plaintiffs and other members of the Tuition Class paid substantial tuition for live, in-person instruction in physical classrooms on a physical campus with all the attendant benefits.

160.    Plaintiffs and other members of the Tuition Class conferred a benefit on Defendant when they paid this tuition.

161.    Defendant has realized this benefit by accepting such payment.

162.    However, Plaintiffs and other members of the Tuition Class did not receive the full benefit of their bargain.

163.    Instead, Plaintiffs and other members of the Tuition Class conferred this benefit on Defendant in expectation of receiving one product, *i.e.*, live in-person instruction in a physical classroom along with the on-campus experience of campus life as described more fully above, but they were provided with a materially different product carrying a different fair market value, *i.e.*, online instruction devoid of the on-campus experience, access, and services.

164.    Defendant has retained this benefit, even though Defendant has failed to provide the services for which the tuition was collected, making Defendant's retention unjust under the circumstances.

165.    It is significantly cheaper for Defendant to provide the online product than the on-campus product.

166.    As a result of closing campus and moving classes online, Defendant saved significant sums of money in the way of reduced utility costs, reduced maintenance and staffing requirements, reduced or eliminated hours for hourly employees, reduced or eliminated hours for paid work study students, and otherwise.

167.    Simply put, it is significantly cheaper to operate a remote, on-line campus than a fully open physical campus.  But even if it was not, it is not the product that students were offered and not the product the students expected to receive.

168.    Equity and good conscience require that the University return a portion of the

monies paid in tuition to Plaintiffs and other members of the Tuition Class.

169.    This cause of action does not seek to allege "academic malpractice."

170.    Defendant should be required to disgorge this unjust enrichment to the extent that Defendant has retained more than the fair market value for the product that Defendant was able to provide.

**FOR A THIRD COLLECTIVE CAUSE OF ACTION
BREACH OF CONTRACT**

**<u>(Plaintiffs and Other Members of the Fees Class)</u>**

171.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

172.    Plaintiffs bring this count on behalf of themselves and other members of the Fees Class.

173.    In addition to tuition, Defendant charges a number of mandatory fees.

174.    In its publications and, particularly on its website, Defendant specifically describes the nature and purpose of each fee.

175.    Some fees apply broadly to all or certain groups of students, while other fees are program or course based.

176.    Such fees are set forth not only in amount but also in description and purpose through the various academic catalogs and on the website.

177.    As such, it is axiomatic that the monies Plaintiffs and other members of the Fees Class paid towards these fees were intended by both the students and Defendant to cover the services, access, benefits and programs for which the fees were described and billed.

178.    By way of example, Defendant describes, at https://sfs.columbia.edu/content/undergraduate-24,  its "Student Life Fee" as follows:

All undergraduate students registered in Columbia College, the Fu Foundation School of Engineering and Applied Science, and the School of General Studies shall be charged a Student Life Fee. This fee combines the student activity fee, career education fee, house system fee, printing fee, the recreational facilities fee, information technology fee, the Lerner fee, which supports activities at the student center, and the Cross-cutting Multi-school Activities fee, which supports new University-wide student activities.

179.    The Student Life Fee is specifically stated to "provide students access to the facilities at the Dodge Physical Fitness Center and Lerner Hall, and library and computer network privileges."[26]

180.    Likewise, Defendant describes, at https://sfs.columbia.edu/content/residence-unit-53, its "University Facilities Fee" as follows:

All students registered on the Morningside Campus shall be charged a University Facilities Fee. Each program calculates the amount of the fee differently, depending on the student's status. This fee combines the Recreational Facilities Fee, Information Technology fee, the Lerner Fee which supports activities at the student life center, and the Cross-cutting Multi-school Activities Fee which supports new University-wide student activities.

181.    The University Facilities Fee is also specifically stated to "provide students access to the facilities at the Dodge Physical Fitness Center and Lerner Hall."[27]

182.    The University states that the Health and Related Services Fee grants students "access [to] the programs and services provided through Columbia Health's five departments, including 24/7 support from Counseling & Psychological Services, Medical Services, and Sexual Violence Response."[28]

183.    As such, in accepting these terms and paying these fees, a contract was formed

---

[26] https://cc-seas.financialaid.columbia.edu/content/student-life-fee.
[27] https://socialwork.columbia.edu/admissions/tuition-financial-aid/cost-attendance-new-york-city-campus-explanation/.
[28] *Id.*

between Plaintiffs, including the Fees Class, and Defendant, which provided that Plaintiffs and other members of the Fees Class would pay these fees for or on behalf of themselves and, in exchange, Defendant would provide or make available the services, access, benefits and/or programs related to those fees, as promised.

184.    It is undisputed that Defendant did not provide student activities, on-campus printing facilities, access to recreational facilities, access to campus-based information technology resources, access to any of Columbia Health's five departments or access to the Lerner Student Center for a portion of the Spring 2020 semester.

185.    Plaintiffs and other members of the Fees Class fulfilled their end of the bargain when they paid these fees for the Spring 2020 semester, either by paying out of pocket or by using student loan financing, or otherwise.

186.    However, Defendant breached the contract with Plaintiffs and other members of the Fees Class by moving all classes for the Spring 2020 semester to online distance learning platforms, constructively evicting students from campus, closing most campus buildings and facilities, and cancelling most student activities.

187.    Defendant has acknowledged such breach and has already refunded or offered to refund some of these fees.

188.    However, such refunds are arbitrary and wholly insufficient.

189.    By way of non-exclusive example, Student A paid total fees for the Spring 2020 semester in the amount of $1,065.

190.    However, Student A received a refund of only $119, or roughly 11%.

191.    Defendant's calculation for refunding Spring 2020 semester fees is not only at odds with common sense and the terms of the above described contract, but also conflicts with

Defendant's own admissions.

192.   For example, at https://sfs.columbia.edu/content/advanced-architectural-design-14, Defendant has already conceded that, as long as campus is closed, Defendant is unable to provide at least 50% of the services for which the University Facilities Fee is intended to cover, and that the fee would be reduced accordingly for the upcoming summer term:

> Note: Due to campus disruption as a result of COVID-19, the Morningside Facilities fee (Student Life fee for undergraduates) will be reduced in recognition that certain services are not available. In the summer term, the fee which covers Athletic facilities will not be included.  As a result, all students assessed will pay only the IT portion. Those who have been assessed $496 will only be assessed $249. Those that would have been assessed $247, will not be assessed this term.

193.   Although Defendant's admissions serve as a starting point for the analysis and support this cause of action, there are yet other fees that Defendant has refused and continues to refuse to refund.

194.   By retaining fees paid by Plaintiffs and other members of the Fees Class, without providing them the full benefit of their bargain, Defendant has failed to perform its contractual obligations.

195.   Plaintiffs and other members of the Fees Class have suffered damage as a direct and proximate result of Defendant's breach, namely being deprived of the value of the services, access, benefits and/or programs the fees were intended to cover.

196.   As a direct and proximate result of Defendant's breach, Plaintiffs and other members of the Fees Class are legally and equitably entitled to damages, to be decided by the trier of fact in this action, to include disgorgement of the pro-rata amount of fees that were collected but for which services were not provided.

**FOR A FOURTH COLLECTIVE CAUSE OF ACTION**
**UNJUST ENRICHMENT**

**(Plaintiffs and Other Members of the Fees Class)**

197.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

198.    Plaintiffs bring this count on behalf of themselves and other members of the Fees Class.

199.    This claim is pled in the alternative to, and to the extent it is determined a contract does not exist or otherwise apply, the contract-based claim set forth in the Third Cause of Action above.

200.    Defendant has received a benefit at the expense of Plaintiffs and other members of the Fees Class to which it is not entitled.

201.    Plaintiffs and other members of the Fees Class paid substantial student fees for on-campus services, access, benefits and/or programs and did not receive the full benefit of the bargain.

202.    Plaintiffs and other members of the Fees Class conferred this benefit on Defendant when they paid the fees.

203.    Defendant realized this benefit by accepting such payment.

204.    Defendant has retained this benefit, even though Defendant has failed to provide the services, access, benefits and/or programs for which the fees were collected, making Defendant's retention unjust under the circumstances.

205.    Equity and good conscience require that Defendant return a portion of the monies paid in fees to Plaintiffs and other members of the Fees Class.

206.    Defendant should be required to disgorge this unjust enrichment to the extent that

Defendant has retained more than the fair market value for the product that Defendant was able to provide.

## FOR A FIFTH COLLECTIVE CAUSE OF ACTION
## CONVERSION

### (Plaintiffs and Other Members of the Tuition Class)

207.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

208.    Plaintiffs bring this count on behalf of themselves and other members of the Tuition Class.

209.    The two key elements of conversion are (1) Plaintiffs' legal ownership or an immediate superior right of possession to a specific identifiable thing, and (2) Defendant's unauthorized dominion over the thing in question or interference with it, to the exclusion of Plaintiffs' right.

210.    Plaintiffs and members of the Tuition Class have an identifiable legal ownership to the right and services of an in-person, on-campus educational experience and paid tuition funds for the same.

211.    As set forth above, Defendant has not provided those services or access to the exclusion of Plaintiffs' and other members of the Tuition Class's rights.

212.    As set forth above, Plaintiffs and other members of the Tuition Class have not, to date, received from Defendant a proper reimbursement for tuition paid to Defendant for the 2020 Spring semester.

213.    Defendant has received and retained possession of Plaintiffs' and other members of the Tuition Class's full payments for tuition for the 2020 Spring semester.

214.    Defendant's continued possession of the full payments for the 2020 Spring semester

tuition is adverse and in derogation of Plaintiffs' and the other members of Tuition Class's entitlement to such funds.

215.    Defendant refuses to remit Plaintiffs' and the other members of the Tuition Class's reimbursement for tuition paid for the 2020 Spring semester.

216.    Defendant has therefore converted and continues to convert Plaintiffs' and the other members of the Tuition Class's 2020 Spring semester tuition.

## FOR A SIXTH COLLECTIVE CAUSE OF ACTION
## CONVERSION

### (Plaintiffs and Other Members of the Fees Class)

217.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

218.    Plaintiffs bring this count on behalf of themselves and other members of the Fees Class.

219.    The two key elements of conversion are (1) Plaintiffs' legal ownership or an immediate superior right of possession to a specific identifiable thing, and (2) Defendant's unauthorized dominion over the thing in question or interference with it, to the exclusion of Plaintiffs' right.

220.    Plaintiffs, and other members of the Fees Class, have an identifiable legal ownership to the services, access, benefits and/or programs paid for through their fees.

221.    As set forth above, Defendant has not provided or made available those services, benefits, programs and/or access thereto, to the exclusion of Plaintiffs' and other members of the Fee Class's rights.

222.    As set forth above, Plaintiffs and other members of the Fees Class have not, to date, received from Defendant a proper reimbursement for fees paid to Defendant for the 2020 Spring

semester.

223.    Defendant has received and retained possession of Plaintiffs' and other members of the Fees Class's payments for fees for the 2020 Spring semester.

224.    Defendant's continued possession of payments for 2020 Spring semester fees is adverse and in derogation of Plaintiffs' and other members of the Fees Class's entitlement to such funds.

225.    Defendant refuses to remit to Plaintiffs and other members of the Fees Class a reimbursement for fees paid for the 2020 Spring semester.

226.    Defendant has therefore converted and continues to convert Plaintiffs' and other members of the Fees Class's 2020 Spring semester fees.

**FOR A SEVENTH COLLECTIVE CAUSE OF ACTION**
**VIOLATIONS OF NY GENERAL BUSINESS LAW § 349, § 350, *ET SEQ.***

**(Plaintiffs and Other Members of the Tuition Class)**

227.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

228.    Plaintiffs bring this count on behalf of themselves and other members of the Tuition Class.

229.    New York General Business Law § 349: Deceptive Acts and Practices Unlawful provides for consumer protection by declaring as unlawful "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state . . . ."[29]

230.    New York General business Law § 350: False Advertising Unlawful provides that "False advertising in the conduct of any business, trade or commerce or in the furnishing of any

---

[29] *See* New York General Business Law § 349.

service in this state is hereby declared unlawful."[30]

231.    Defendant, through its agents, servants, and employees, engaged in unlawful, unfair, deceptive and fraudulent acts and practices in violation of New York General Business Law § 349, § 350, *et. seq.* by engaging in the activities described herein.

232.    Defendant is a private university which, among other things, offered in-person, hands-on curriculum to Plaintiffs and other members of the Tuition Class.

233.    Plaintiffs and other members of the Tuition Class are consumers who have paid substantial tuition and fees to attend in-person, hands-on curriculum at Defendant's University for the Spring 2020 semester.

234.    Defendant's efforts to sell its services to prospective students, which included Plaintiffs and other members of the Tuition Class, were "consumer-oriented."

235.    As part of its marketing practices and recruitment efforts, as described above, Defendant made numerous statements, representations and omissions to the public (including Plaintiffs and members of the Tuition Class) with respect to the in-person educational opportunity and on-campus experience that students who enrolled at the Defendant would receive.  Such statements, representations and omissions, which were uniform and identical in nature, were intended to induce potential students to enroll at the University for the Spring 2020 semester.

236.    With the reasonable expectation that students who enrolled at the University would receive in-person academic instruction with an on-campus experience for the entire 2020 Spring semester, Plaintiffs and other members of the Tuition Class paid tuition to Defendant.

237.    However, students did not receive an in-person academic instruction with on-campus experience, access and services for the entire 2020 Spring semester.  As a result, Plaintiffs

---

[30] *See* New York General Business Law § 350.

and other members of the Tuition Class were proximately caused to pay inflated tuition because they were deprived of in-person academic instruction and an on-campus experience, access and services for the Spring 2020 semester.

238.    Therefore, the aforementioned statements, representations and omissions made by the University were objectively false, misleading and deceptive to Plaintiffs and the other Tuition Class Members, as well as the public at large.

239.    Defendant's above-alleged actions constitute unfair business practices since the actions were deceptive and injurious to Plaintiffs and other members of the Tuition Class because students enrolled for the Spring 2020 term did not benefit from on-campus academic instruction and a unique on-campus experience during the entire spring term.

240.    In fact, Plaintiffs and other students were not permitted to receive and benefit from on-campus academic instruction and a unique on-campus experience during the entire Spring 2020 semester.

241.    Defendant's acts and practices were designed to lead potential students, and the public, to believe that if students enrolled at the University then they would be entitled to receive in-class instruction and a unique campus experience for the entire Spring 2020 semester.

242.    Plaintiffs and other members of the other Tuition Class Members were deceived and injured because students did not receive in-class instruction and a unique campus experience for the entire Spring 2020 semester.

243.    As a result of Defendant's foregoing violations of New York General Business Law § 349, § 350, *et seq.*, Defendants have directly and proximately caused damage to Plaintiffs and other members of the Tuition Class and are entitled to recover actual damages in an amount to be determined at trial, and an award of reasonable attorney's fees, expenses, costs and disbursements.

**FOR AN EIGHTH COLLECTIVE CAUSE OF ACTION**
**VIOLATIONS OF NY GENERAL BUSINESS LAW § 349, § 350 *ET SEQ.***

**(Plaintiffs and Other Members of the Fees Class)**

244.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

245.    Plaintiffs bring this count on behalf of themselves and other members of the Fees Class.

246.    Defendant's actions constitute unlawful, unfair, deceptive and fraudulent practices as defined by New York's Deceptive Acts and Practices Law, NY General Business Law § 349, § 350, *et seq.*

247.    Consumer-oriented conduct has been defined as conduct that potentially affects similarly situated consumers.

248.    Defendant is a private university which, among other things, offered in-person, hands-on curriculum to Plaintiffs and other members of the Fees Class's and its efforts to sell its services to prospective students, which included Plaintiffs were "consumer-oriented."

249.    Plaintiffs and other members of the Fees Class were required to pay certain mandatory fees as a condition to student enrollment at the University for the Spring 2020 semester, including, but not limited to, a Facilities Fee, Student Activity Fee, and a Health and Related Services Fee.

250.    As discussed above, Defendant made statements, representations and omissions to the public, including Plaintiffs and other members of the Fees Class, with respect to such fees.

251.    These statements, representations and omissions, which were uniform and identical in nature, were intended to induce potential students, including Plaintiffs and members of the Fees Class, to enroll at the University and pay or cause to have paid mandatory fees for the Spring 2020

semester.

252.    With the reasonable expectation that students who enrolled at the University would be entitled to receive services, programs and/or benefits for which fees were charged for the entire Spring 2020 semester, Plaintiffs and other members of the Fees Class agreed to pay such fees.

253.    However, students did not receive the services, programs and/or benefits for which fees were charged for the entire Spring 2020 semester.  As a result, Plaintiffs and other members of the Fees class were proximately caused to overpay such fees because the related services, programs and/or benefits were not available to students for the entire Spring 2020 semester.

254.    Therefore, the aforementioned statements, representations and omissions made by the University were objectively false, misleading and deceptive to Plaintiffs and the other Fee Members, as well as the public at large.

255.    Defendant's above-alleged actions constitute unfair business practices since the actions were deceptive and injurious to Plaintiffs and other members of the Fees Class because students enrolled at the University did not receive services, programs and/or benefits for which fees were paid for the entire Spring 2020 semester.

256.    Defendant's acts and practices were designed to lead potential students, and the public, to believe that if students enrolled at the University and paid the mandatory fees then they would be entitled receive the services, programs and/or benefits for which such fees were charged and paid for the entire Spring 2020 semester.

257.    Plaintiffs and the other Fees Class Members were deceived and injured because students were not entitled to receive the services, programs and/or benefits for which the mandatory fees were charged and paid for the entire Spring 2020 semester.

258.    As a result of Defendant's foregoing violations of New York General Business Law

§ 349, § 350, *et. seq.* Defendants have directly and proximately caused damage to Plaintiffs and other members of the Fees Class and are entitled to recover actual damages in an amount to be determined at trial, and an award of reasonable attorney's fees, expenses, costs and disbursements.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of members of the Classes, pray for judgment in their favor and against Defendant as follows:

A.      Certifying the Classes as proposed herein, designating Plaintiffs as Class representatives, and appointing undersigned counsel as Class Counsel;

B.      Declaring that Defendant is financially responsible for notifying the Class members of the pendency of this action;

C.      Declaring that Defendant has wrongfully kept monies paid for tuition and fees;

D.      Requiring that Defendant disgorge amounts wrongfully obtained for tuition and fees;

E.      Awarding injunctive relief as permitted by law or equity, including enjoining Defendant from retaining the pro-rated, unused monies paid for tuition and fees;

F.      Scheduling a trial by jury in this action;

G.      Awarding Plaintiffs' reasonable attorney's fees, costs and expenses, as permitted by law;

H.       Awarding pre and post-judgment interest on any amounts awarded, as permitted by law; and

I.      Awarding such other and further relief as may be just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demands trial by

jury in this action of all issues so triable.

Dated July 22, 2020

**GAINEY McKENNA & EGLESTON**

By: */s/ Thomas J. McKenna*
 Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017
Tel.: (212) 983-1300
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

**TOPTANI LAW PLLC**
Edward Toptani
375 Pearl Street, Suite 14106
New York, NY 10038
Tel: (212) 699-8930
Email: edward@toptanilaw.com

**ANASTOPOULO LAW FIRM, LLC**

By: */s/ Roy T. Willey IV*
Roy T. Willey IV*
Eric M. Poulin*
32 Ann Street
Charleston, SC 29403
Tel: (843) 614-8888
Email: roy@akimlawfirm.com
Email: eric@akimlawfirm.com

**MOREA SCHWARTZ BRADHAM
FRIEDMAN & BROWN LLP**
John M. Bradham
444 Madison Avenue, 4th Floor
New York, NY 10022
Tel: (212) 695-8050
Email: jbradham@msbllp.com

*\*Admitted pro hac vice*